IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY HALES,                  )
           Petitioner,         )      Civil Action No. 14-181 Erie
                            )
           v.               )      District Judge Barbara Rothstein
                            )      Magistrate Judge Susan Paradise Baxter
BRIAN COLEMAN, et al.,        )
           Respondents.     )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that the petition for a writ of habeas corpus filed pursuant to

28 U.S.C. § 2254 by state prisoner Anthony Hales (the "Petitioner") be denied and that a certificate of

appealability be denied.

### II.    REPORT

#### A.    Relevant Background

In this habeas case, Petitioner is challenging the judgment of sentence that was imposed upon

him by the Court of Common Pleas of Erie County on March 8, 2012. The charges against Petitioner

were filed in connection with the January 28, 2011, murder of his girlfriend, Christina Hulsinger. The

day after the murder, on January 29, 2011, Petitioner confessed to his mother, Susan White, that he

killed Hulsinger. At that time, Petitioner was at his mother's home and she called 911. Trooper Donald

Claypoole came to White's home and took Petitioner into custody. During the ride to the station,

Petitioner confessed to Trooper Claypoole. That same day, Petitioner was interviewed by Trooper

Christopher O'Neill. That interview was videotaped and during it Petitioner again confessed to the murder. That videotaped statement was played for the jury at Petitioner's subsequent trial.

Gene P. Placidi, Esquire, was Petitioner's defense attorney. Petitioner, through counsel, filed a pre-trial motion to suppress the statements he made to Trooper Claypoole and Trooper O'Neill on the grounds that he was incapable of making a voluntary and knowing waiver of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) because he was under the influence of crack cocaine. The trial court held a hearing on that motion on June 1, 2011, at which Trooper Claypoole, Trooper O'Neill, and Petitioner's mother (White) testified.

On July 1, 2011, the trial court issued a 10-page opinion in which it denied Petitioner's suppression motion. It applied the "totality of the circumstances" test and determined that the Commonwealth met its burden of proving by a preponderance of the evidence that Petitioner's waiver of his <u>Miranda</u> rights were made knowingly and intelligently (ECF No. 6-8 at 8-18, <u>Commonwealth v. Hales</u>, No. 664 of 2011, slip op. at 5-10 (July 1, 2011) ("<u>Hales 1</u>")). <u>See</u> <u>also</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (the waiver of <u>Miranda</u> rights "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.") (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979) and citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 754-75 (1979)).

Petitioner's two-day trial commenced on January 23, 2012. The trial court summarized the evidence introduced at the trial as follows:

The facts surrounding Victim's murder can be briefly summarized as follows: Testimony and evidence revealed that [Petitioner] and Victim were in a relationship and were residing together at 2084 Lake St. Apt. 3, in Lake City, Pennsylvania. During his videotaped confession admitted at trial, (Commonwealth's Exhibit 1), [Petitioner] stated that on January 28, 2011, he and Victim were smoking crack cocaine together at their residence. [Petitioner] stated that sometime after the two had used the drug, and while they were alone, he began to choke Victim without provocation. See Commonwealth's Exhibit 1. [Petitioner] conveyed information regarding the murder in a calm and lucid manner, and with graphic detail. Id. He continued and told the officer that after he choked her "she was still breathing … like she was making noises and I kept going and … I couldn't do that anymore, and you know she was already on the floor and she was basically already dead, you know, so I had to do something…." Id. At this point [Petitioner] explained he "panicked" and said "… It's too late now, … so you know I tried snapping her neck and I couldn't do that, so basically I just stood back and she was like gurgling, so I grabbed the kitchen knife and slit her throat." Id. [Petitioner] described to the officer that he had grabbed the biggest knife from the butcher block that measured "ten inches to a foot." Id. Later in the interview, when [Petitioner] was asked if he had stabbed Victim with the knife, he stated "no." Id. [Petitioner] explained that he cut her throat "twice." Id. When asked why he cut Victim's throat twice, he stated he "didn't do it right the first time" because it was too "superficial." Id. He then explained that the second cut "went in a little deeper." Id. At this time, he left her on the floor and wrapped her in a blanket. Id.

[Petitioner] then proceeded to take Victim's car and withdraw cash from her account to purchase additional crack cocaine. Id. [Petitioner] confessed that he smoked crack cocaine throughout the night while he drove around in Victim's car before checking into a hotel room. Id.

In the morning, [Petitioner] stated that he drove to his Mother's house and confessed to her what happened. Id. Shortly thereafter, [Petitioner's] mother called 911 and authorities arrived and arrested [Petitioner]. See N.T. Trial Day One at 59-61. On the way to the police station, [Petitioner] again confessed to authorities. Id. at 64-65. As noted above, he then confessed a third time in explicit detail on the videotape at the station. Id. at 67; see also Commonwealth's Exhibit 1.

The examination and autopsy performed by Dr. Eric Vey, of the Erie County Coroner's Office, revealed that Victim's cause of death was "manual strangulation," and "sharp force injury" consisting of two "deep-incised" cuts to the Victim's neck. See N.T. Trial Day Two at 14, 21. The autopsy report disclosed that one cut was approximately five inches and the other was one and a half inches. Id. The Victim ultimately bled to death.

(ECF No. 6-8 at 1-18, Commonwealth v. Hales, No. 664 of 2011, slip op. at 2-4 (C.P. Erie June 4, 2012)

("Hales 2")).

At his trial, Petitioner presented a diminished capacity defense due to his voluntary intoxication.[1] Specifically, he contended that he was unable to formulate the specific intent to kill because of his crack cocaine use. The jury was not persuaded by his defense and found him guilty of first-degree murder. The court sentenced him to the mandatory term of life imprisonment.

In his direct appeal to the Superior Court of Pennsylvania, Petitioner claimed that the trial court erred in denying his motion to suppress. On December 19, 2012, the Superior Court issued an opinion in which it affirmed Petitioner's judgment of sentence. (ECF No. 6-11, Commonwealth v. Hales, No. 583 WDA 2012, slip op. (Pa.Super.Ct. Dec. 19, 2012) ("Hales 3")). The Superior Court denied Petitioner's claim on the merits. As discussed in more detail below, it held that the trial court did not err in finding that Petitioner made a knowing and voluntary decision to waive his Miranda rights. (Hales 3, No. 583 WDA 2012, slip op. at 5-10).

Petitioner did not file a petition for allowance of appeal ("PAA") with the Pennsylvania Supreme Court. Accordingly, his judgment of sentence became final on January 18, 2013, which is the date upon which the time for him to file a PAA expired. Gonzalez v. Thaler, — U.S. — , 132 S.Ct. 641, 653-56 (2012) (a judgment becomes final at the conclusion of direct review or the expiration of time for seeking such review). See also Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000).

On or around September 27, 2013, Petitioner filed with his trial court a timely *pro se* petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA.CONS.STAT.ANN. § 9541 *et seq.* (ECF No. 6-10). He claimed that he received ineffective assistance in violation of his Sixth Amendment

---

[1]     Pennsylvania law provides: "Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negative the element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder." 18 PA.CONS.STAT.ANN. § 308.

rights because Attorney Placidi did not call George Dowd or Dr. Robert Wettstein as an expert witness to support his diminished capacity defense.

The trial court appointed William J. Hathaway, Esquire, to represent Petitioner in the PCRA proceeding. Hathaway subsequently filed a petition for leave to withdraw as counsel and an accompanying "no-merit" letter pursuant to Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988) and Commonwealth v. Finley, 550 A.2d 213 (Pa. 1988) in which he explained that, in his professional judgment, Petitioner failed to state a colorable claim for PCRA relief. (ECF No. 6-12).

The trial court granted Hathaway's motion to withdraw and issued an opinion in which it provided notice that it was going to dismiss Petitioner's PCRA petition without a hearing in accordance with Pennsylvania Rule of Criminal Procedure 907. (ECF No. 6-9, Commonwealth v. Hales, No. 665 of 2011, slip op. (C.P. Erie Jan. 23, 2014) ("Hales 4"). On February 17, 2014, the trial court entered its final order dismissing Petitioner's PCRA petition. Petitioner had 30 days, until on or around March 19, 2014, to file an appeal to the Superior Court. He did not meet that deadline. On April 30, 2014, he filed an application to file an appeal *nunc pro tunc*, which the trial court denied on May 5, 2014. It held:

> In order to reinstate his appellate rights nunc pro tunc, [Petitioner] must show extraordinary circumstances wherein a direct appeal by right was lost. Commonwealth v. Stock, 679 A.2d 760, 764 (Pa. 1996). [Petitioner] avers that from January 2, 2014 until March 10, 2014, he was housed in the restricted housing unit of the State Correctional institute at Fayette, and he had no access to a typewriter. However, there is no requirement that a notice of appeal be typed. Consequently, [Petitioner] has failed to establish extraordinary circumstances pursuant to Stock, supra.

(ECF No. 6-3).

On June 20, 2014, Petitioner filed with this Court his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996

5

("AEDPA"). He raises two claims for relief. He contends, as he did in his direct appeal, that the introduction at his trial of his statements to Troopers Claypoole and O'Neill violated his Fifth Amendment rights because he did not knowingly and intelligently waive his <u>Miranda</u> rights. (ECF No. 1, petition at 8) He also contends, as he did during his PCRA proceeding, that his trial counsel provided him with ineffective assistance for failing "to investigate and obtain psychiatric expert testimony" to support his diminished capacity defense. (<u>Id.</u> at 6).

Respondents filed their answer (ECF No. 6) and the relevant state court records. After Respondents filed their answer, Petitioner filed a memorandum of law in support of his request for habeas relief. (ECF No. 12).[2]

## B. Standard of Review

Under 28 U.S.C. § 2254, "[t]he Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable in a federal habeas action. <u>Id.</u> <u>See also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).

---

[2] Respondents contend, *inter alia*, that Petitioner's claims are untimely under the applicable statute of limitations, 28 U.S.C. § 2244(d). As Petitioner points out in his memorandum of law, however, Respondents' calculation is incorrect. Petitioner filed his habeas claims within the statute of limitations. AEDPA requires, with a few exceptions not applicable here, that habeas corpus claims under 28 U.S.C. § 2254 be filed within one year of the date the petitioner's judgment of sentence became final. 28 U.S.C. § 2244(d)(1)(A). It also provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). As set forth above, Petitioner's judgment of sentence became final on or around January 18, 2013. He filed his PCRA petition 252 days later, on September 27, 2013. In accordance with § 2244(d)(2), that PCRA petition statutorily tolled AEDPA's limitations period beginning on September 27, 2013. Petitioner's PCRA proceeding concluded on March 19, 2014, which is the date the time for him to file an appeal to the Superior Court expired. <u>Lawrence v. Florida</u>, 549 U.S. 327, 331-36 (2007); <u>Swartz</u>, 204 F.3d at 419-20. AEDPA's limitations period began to run again the next day, on March 20, 2014. Since 252 days had expired already from the limitations period, Petitioner had 113 more days – until on or around July 11, 2014 – to file a timely federal habeas petition. He met that deadline.

In describing the role of federal habeas proceedings, the United States Supreme Court noted:

[I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

Barefoot v. Estelle, 463 U.S. 880, 887 (1983).

In 1996, Congress enacted AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). AEDPA "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations." Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004); see also Lewis v. Horn, 581 F.3d 92, 109-18 (3d Cir. 2009). AEDPA reflects the view that habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)).

AEDPA's standard of review is codified at 28 U.S.C. § 2254(d) and it provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Thus, AEDPA circumscribes a federal habeas court's review of a state prisoner's constitutional claim when the state court adjudicated that claim on the merits and denied it. For the

purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when a state court decision is "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Robinson v. Beard, 762 F.3d 316, 324 (3d Cir. 2014) (quoting Simmons v. Beard, 590 F.3d 223, 232 (3d Cir. 2009)).

A state court decision is "contrary to … clearly established Federal law, as determined by the Supreme Court[,]" 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," Williams v. Taylor, 529 U.S. 362, 405 (2000), or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," id. at 406. Few adjudications by state courts fall within § 2254(d)(1)'s "contrary to" clause.

Most state court's adjudications must be evaluated under § 2254(d)(1)'s "unreasonable application" clause. "If the state court decision identifies the correct governing legal principle in existence at the time [such as, in this case, the standards for claims raised under Miranda v. Arizona, 384 U.S. 436 (1966) or Strickland v. Washington, 466 U.S. 668 (1984)], a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner's case." Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. 1388, 1399 (2011) (quotation marks omitted). The Supreme Court advised:

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. See [Lockyer v. Andrade, 538 U.S. 63, 75 (2003)].
>     If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). **It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's**

**precedents. It goes no farther…. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.**

Harrington, 562 U.S. at 102-03 (parallel citations omitted) (emphasis added).

Finally, the test for § 2254(d)(2)'s "unreasonable determination of facts" clause:

is whether the petitioner has demonstrated by "clear and convincing evidence," § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. See Rice v. Collins, 546 U.S. 333, 338-339 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting § 2254(e)(1)) (citing Miller-El v. Dretke, 545 U.S. 231, 240 (2005)); see also Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ("Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence."). Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication. Cullen v. Pinholster, — U.S. — [ ], 131 S. Ct. 1388, 1401-03 (2011).

Rountree v. Balicki, 640 F.3d 530, 537-38 (3d Cir. 2011) (parallel citations omitted).

In addition, specific findings of fact made by a state court have always been afforded

considerable deference in federal habeas, even prior to the enactment of AEDPA. As the United States

Court of Appeals for the Third Circuit explained:

It is a well-established principle of federal law that state trial judges deserve substantial deference.

Face to face with the living witnesses, the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases, the exercise of his power of observation often proves the most accurate method of ascertaining the truth … how can we say he is wrong? We never saw the witnesses.

Nara v. Frank, 488 F.3d 187, 201 (3d Cir. 2007) (quoting United States v. Oregon Medical Society, 343

U.S. 326, 339 (1952), which was quoting Boyd v. Boyd, 169 N.E. 632 (N.Y. 1930)). AEDPA continued

that substantial deference and requires that "a determination of a factual issue made by a State court **shall be presumed to be correct**. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1) (emphasis added).

## C.    Discussion

### 1.    <u>Miranda</u> Claim

Petitioner contends that the introduction at his trial of his statements to Troopers Claypoole and O'Neill violated his Fifth Amendment rights because his statements to the police "were given while he was under the influence of crack cocaine[,]" and, therefore, the waiver of his <u>Miranda</u> rights was not knowing and voluntary. (ECF No. 1, petition at 8). As explained above, the Superior Court denied this claim on the merits. It held:

> "When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession is voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession." <u>Commonwealth v. Ogrod</u>, 576 Pa. 412, 456, 839 A.2d 294, 320 (2003). The question of voluntariness turns on whether the defendant was deprived of his ability to make a free and unconstrained decision to confess. <u>Id.</u>
> [Petitioner] contends that he was under the influence of drugs to such a degree that he was incapable of making a knowing and voluntary decision to waive his <u>Miranda</u> rights…. Intoxication, standing alone, is not sufficient to render a confession involuntary. <u>Commonwealth v. Manning</u>, 495 Pa. 652, 656, 435 A.2d 1207, 1219 (1981). "The test is whether there was sufficient mental capacity for the defendant to know what he was saying and to have voluntarily intended to say it." <u>Id.</u>
> During the suppression hearing, Trooper Claypoole testified regarding [Petitioner's] arrest. He explained that [Petitioner] was compliant and polite while being handcuffed and escorted to the police vehicle. (Notes of testimony, 6/1/11 at 15-17.) Trooper Claypoole testified that during the ten minute drive to the police barracks, [Petitioner] volunteered information about killing his girlfriend and smoking crack cocaine. (Id. at 19.) Trooper Claypoole promptly told [Petitioner] to "wait, I have to paraphrase <u>Miranda</u> for you, you can't speak until I get this out." (<u>Id.</u> at 20.) Trooper Claypoole then paraphrased [Petitioner's] <u>Miranda</u> rights, including the right to remain silent and the right to an attorney.[5] The Trooper asked him if he understood the rights explained to him and [Petitioner] responded affirmatively. (<u>Id.</u> at 21.)

10

⁵ At no time during the suppression hearing did the defense challenge the trooper's paraphrasing and administration of <u>Miranda</u>.

[Petitioner] then indicated that he wanted to talk and proceeded to tell Trooper Claypoole what happened on the night in question. (<u>Id.</u> at 21-22.) [Petitioner] provided a timeline of the previous night as well as details as to how he killed the victim. (<u>Id.</u> at 22.) [Petitioner] described where the victim could be found and also described that he drove around for a few hours in Ohio after the murder. (<u>Id.</u> at 22-23.) [Petitioner] was "very articulate. He was rather quiet, but very understandable. I would guess to use the word stoic, plain, was extremely articulate." (<u>Id.</u> at 23.) Trooper Claypoole asked [Petitioner] if he was currently high or under the influence of drugs and [Petitioner] stated that he was not. (Id. at 24.) At the suppression hearing, the trooper explained that he had been a trooper for over 13 years and had observed many individuals under the influence of drugs and alcohol, including crack cocaine, on hundreds of occasions. (<u>Id.</u> at 28-29.) He explained that [Petitioner] did not manifest or display any of the signs indicating that he was under the influence of a controlled substance. (<u>Id.</u> at 29.)

At the police barracks, [Petitioner] sat with Trooper Claypoole until Trooper Christopher O'Neill arrived, approximately 15 minutes later, to conduct the interview. Trooper O'Neill testified that [Petitioner] was cordial/friendly and cooperative. (<u>Id.</u> at 46.) Upon entering the interview room at the barracks, Trooper O'Neill read [Petitioner] his <u>Miranda</u> rights and [Petitioner] was also provided with an opportunity to read his rights from a sheet. (<u>Id.</u> at 48-49.) Thereafter, [Petitioner] signed his waiver of rights at approximately 1:02 p.m. (<u>Id.</u> at 51.) Trooper O'Neill videotaped the waiver of [Petitioner's] rights and the interview. (<u>Id.</u> at 48-49, 51-52.) The interview lasted approximately 50 minutes.

Trooper O'Neill, who has conducted several hundred interviews, noted that throughout the process [Petitioner] was very calm and cognizant of what was occurring. (<u>Id.</u> at 53.) Based on his experience dealing with individuals under the influence of drugs and alcohol, he did not believe that [Petitioner] was under the influence of anything. (<u>Id.</u> at 55.) However, on cross-examination, Trooper O'Neill stated that [Petitioner] had reported that he was still under the influence of crack cocaine and hoped that there would be someone available to talk with him the next day. (<u>Id.</u> at 73-74.) "[I]t seemed like more of a depression issue than anything else…. It seemed he was alluding to the reality of what had happened he was going to struggle with the next day…. [H]e anticipated the next day that it was even going to be more painful to him and that he hoped that someone would be available to talk to him." (<u>Id.</u>)

[Petitioner's] mother, White, also testified at the suppression hearing. She explained that [Petitioner] had arrived at her home at 10:30 a.m. and told her "I killed [the victim]." (<u>Id.</u> at 83.) White described her son that morning:

He just – he was real – pacing back and forth, his eyes had – just a funny look about him. His eyes were just like black, and he kept listening to something, I

don't know what, you know, he would like turn his head away from us and was, like, listening.

Id.

The suppression court did not err by denying [Petitioner's] suppression motion. Here, as … the trial court detailed, there was no evidence that [Petitioner] was so intoxicated by drugs as to not understand and voluntarily waive his <u>Miranda</u> rights. [Petitioner] understood the questions being asked and was responsive to them. There is no evidence that [Petitioner] had his will overborne physically or mentally, or that he was confused or uncertain as to what the warnings and his waiver meant. The suppression court reviewed the videotaped interview in its entirety; the video recording is approximately 45 minutes long. (See Memorandum Opinion and Order, 7/1/11 at 3, n.3; notes of testimony, [6]/1/11 at 55.) "At all times, [Petitioner] seemed coherent, and fully aware of the situation." (Memorandum Opinion and Order, 7/1/11 at 4.) No testimony was developed at the suppression hearing that would support [Petitioner's] contention that his use of crack cocaine prevented him from knowingly, voluntarily, and intelligently waiving his rights. For instance, the suppression court noted [Petitioner] was "appropriately dressed for the weather, was able to remember specific details such as times and addresses, was not groggy or sleepy, was not hyper-active, spoke coherently, was attentive to the officers, and was able to provide a detailed drawing of the crime scene, properly operated his motor vehicle, demonstrated the ability to utilize a debit card, enter a pin number and withdraw cash." (<u>Id.</u> at 8.) In denying the motion, the court also observed the conditions attendant to the detention and attitude exhibited by the police created an environment where [Petitioner] would not feel pressured or coerced. (<u>Id.</u> at 9.) Based on the totality of the circumstances, the suppression court concluded the statements were voluntary. These findings are supported by the record and, thus, may not be disturbed. This claim must therefore fail.

(<u>Hales 3</u>, No. 583 WDA 2012, slip op. at 5-10).

There is no basis for this Court to disturb the state court's decision to deny relief on this claim under AEDPA's deferential standards of review. The trial court determined that Petitioner knowingly and intelligently waived his privilege against self-incrimination after conducting a hearing on the matter. The Superior Court subsequently affirmed that decision. There is no reason on the record before this Court to reject the credibility assessments the trial court made after considering the suppression hearing testimony, 28 U.S.C. § 2254 (e)(1), and Petitioner has not met his burden of demonstrating that the state courts' decision to deny this claim "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." <u>Id.</u>, § 2254(d)(2). In addition, the state courts properly applied the "totality of the circumstances" test to the events surrounding Petitioner's confessions and interrogation to determine if his decision to waive his <u>Miranda</u> rights was uncoerced and made with the requisite level of comprehension. The state courts thus applied the correct rule of law to the findings of fact made from the evidence introduced at the suppression hearing and Petitioner has not met his burden of demonstrating that the state courts' decision "was contrary to" "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). <u>Williams</u>, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."). And, because Petitioner has not established that the state courts' decision to deny this claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement[,]" <u>Harrington</u>, 562 U.S. at 103, it was not an "unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), either. Accordingly, this claim should be denied.

### 2. Ineffective Assistance Claim

#### a. This claim is procedurally defaulted

A federal habeas court may not grant a state prisoner's petition for a writ of habeas corpus unless he has first presented his federal constitutional claims to the state courts. 28 U.S.C. § 2254(b)(1)(A). This "exhaustion" requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal

13

rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). See also O'Sullivan v. Boerckel, 526 U.S. 838, 842-49 (1999).

> [It is] principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. See Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 490-491, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973). Under our federal system, the federal and state "courts [are] equally bound to guard and protect rights secured by the Constitution." Ex parte Royall, 117 U.S. [241, 251, 6 S.Ct. 734, 740 (1886)]. Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950). See Duckworth v. Serrano, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam) (noting that the exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights").

Rose v. Lundy, 455 U.S. 509, 517 (1982) (footnote omitted), abrogated on other grounds by Rhines v. Weber, 544 U.S. 269 (2006).

Importantly, in order to exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking **one complete round of the State's established appellate review process**." O'Sullivan, 526 U.S. at 845 (emphasis added). In Pennsylvania, this requirement means that a petitioner in a non-capital case **must have presented every federal constitutional claim raised in his habeas petition to the Superior Court of Pennsylvania either on direct or PCRA appeal**. See, e.g., Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

Petitioner carries the burden of proving he exhausted his state court remedies with respect to this claim. See, e.g., Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997). He cannot meet that burden because he did not file a timely notice of appeal with the Superior Court after the trial court issue its

14

order denying this ineffective assistance claim in the PCRA proceeding. Because he did not, this claim now is procedurally defaulted.[3] See, e.g., Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000); Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). See also Rolan v. Coleman, 680 F.3d 311, 317 (3d Cir. 2012) ("Procedural default occurs when a claim has not been fairly presented to the state courts (*i.e.*, is unexhausted) and there are not additional state remedies available to pursue[.]"). Like the exhaustion doctrine, the doctrine of procedural default is "grounded in concerns of comity and federalism," Coleman, 501 U.S. at 730, and it bars federal habeas review of a claim whenever the petitioner failed to raise it in compliance with a state's procedural rules. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wainwright v. Sykes, 433 U.S. 72 (1977); Lines, 208 F.3d at 162-69.

A petitioner who has defaulted a federal habeas claim can overcome the default, thereby allowing federal court review, if he can demonstrate "cause" for the default, *i.e.*, that some objective factor "external to the defense" impeded efforts to comply with the state's procedural rule, and "actual prejudice." See, e.g., Coleman, 501 U.S. at 750; see also Murray v. Carrier, 477 U.S. 478, 488, 494 (1986).[4] Petitioner contends that he did not file an appeal to the Superior Court after trial court denied

---

[3]     Respondents do not argue that this claim is procedurally defaulted. It clearly is because Petitioner did not raise it in an appeal to the Superior Court. This Court has "the authority to raise the issue of procedural default *sua sponte*[,]" Evans v. Secretary Pennsylvania Dept. of Corr., 645 F.3d 650, 656 n.12 (3d Cir. 2011), as long as Petitioner is given fair notice and an opportunity to respond and is not prejudiced. See Day v. McDonough, 547 U.S. 198, 205-10 (2006) (raising statute of limitations *sua sponte*); United States v. Bendolph, 409 F.3d 155, 161-70 (3d Cir. 2005) (en banc) (same); Sweger v. Chesney, 294 F.3d 506, 520 n.3 (3d Cir. 2002) (courts may consider *sua sponte* whether procedural default bars claim); Szuchon v. Lehman, 273 F.3d 299, 321 n.13 (3d Cir. 2001) (same); Smith v. Horn, 120 F.3d 400, 408 (3d Cir. 1997) (same). This Report and Recommendation gives Petitioner the required notice and he has an opportunity to respond to the issue of procedural default in Objections. It is noted, however, that Petitioner anticipated that this claim may be deemed to be procedurally defaulted because in his memorandum of law (ECF No. 12), he points to circumstances that he argues excuses his failure to file an appeal with the Superior Court. Specifically, he cites the rule announced in Martinez v. Ryan, — U.S. —, 132 S.Ct. 1309 (2012), and also asserts that he did not file an appeal because he was in the Restrictive Housing Unit ("RHU") of his correctional institution during the time period in which his notice of appeal was due. Those arguments will be addressed herein.

[4]     A petitioner may also overcome a procedural default of a claim if he can demonstrate a "miscarriage of justice." This exception provides that a procedural default may be excused if the petitioner presents evidence of "actual innocence" that is

15

his PCRA petition because he was in the RHU. (ECF No. 1, petition at 6; ECF No. 12, memorandum of law at 2-3). The mere fact that Petitioner was in the RHU does not establish "cause" to overcome the default of this claim. See, e.g., Magar v. Parker, 490 F.3d 816, 819-20 (10th Cir. 2007) (finding allegation that default was caused by prison officials who put him in RHU insufficient because the petitioner failed to identify any act or omission by prison officials that would have barred his access to the courts). Petitioner does not allege that his access to the courts was in any way interfered with when he was in the RHU. In his memorandum of law, he contends that he did not know how to file a notice of appeal (ECF No. 12, memorandum of law at 3), but a lack of knowledge or an unawareness of procedural rules is not an "external" factor that excuses his failure to file a timely notice of appeal. Cristin v. Brennan, 281 F.3d 404, 420 (3d Cir. 2002) ("Generally, 'cause' cannot be based on the mere inadvertence of the petitioner or petitioner's counsel to take an appeal."); Coleman, 501 U.S. at 752 (discussing ignorant or inadvertent procedural default). Before the trial court, Petitioner contended that he missed the deadline to file an appeal because he did not have access to a typewriter. But as the trial court noted when it denied Petitioner's application to file an appeal *nunc pro tunc*, there is no requirement that a notice of appeal be typed. Indeed, under Pennsylvania law, "[t]he notice of appeal itself is extremely short and simple, and the filing of the notice of appeal with the clerk of the trial court is simple and self-perfecting." G. RONALD DARLINGTON, ET AL., 20 West's Pennsylvania Practice, Appellate Practice § 902:2, available on Westlawnext (database updated Dec. 2014) (citing Pa.R.A.P.

---

"so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" Schlup v. Delo, 513 U.S. 298, 316 (1995). See also House v. Bell, 547 U.S. 518 (2006); Houck v. Stickman, 625 F.3d 88, 93-95 (3d Cir. 2010); Hubbard v. Pinchak, 378 F.3d 333, 339-41 (3d Cir. 2004). It only applies in extraordinary cases where the petitioner demonstrates that a constitutional violation has probably resulted in the conviction of one who is actually innocent. Id.; Hubbard, 378 F.3d at 339-40. It is not applicable to Petitioner's case.

904 (Content of the Notice of Appeal) and Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd., 666 A.2d 395, 398 (Pa. Cmwlth. 1995), rev'd on other grounds 689 A.2d 910 ( Pa. 1997) ("a notice of appeal amounts to little more than evidence of an intention to appeal")).

Finally, to the extent that Petitioner blames his court-appointed PCRA counsel (Attorney Hathaway) for failing to raise this ineffective assistance claim in appeal to the Superior Court[5] (see ECF No. 12, memorandum of law at 24), that argument too lacks merit. Attorney Hathaway was permitted to withdraw as Petitioner's PCRA attorney prior to the conclusion of the PCRA proceeding before the trial court. Therefore, any failure to properly raise this ineffective assistance claim in an appeal to the Superior Court is attributable solely to Petitioner, since he was proceeding *pro se*.

Based upon all of the foregoing, it is recommended that Petitioner's ineffective assistance of counsel claim be denied because it is procedurally defaulted.

### b.    This claim has no merit

In the event the Court does not deny this claim as procedurally defaulted, it should be denied on the merits. Ineffective assistance of counsel claims are governed by Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Petitioner must show that his trial counsel's representation fell below an objective standard of reasonableness. 466 U.S. at 688. The law presumes that Petitioner's trial counsel was effective. Id. at 689. Strickland also requires that Petitioner demonstrate that he was prejudiced by

---

[5]    In Martinez v. Ryan, the Supreme Court held for the first time that in states like Pennsylvania, where state law requires that claims of ineffective assistance of trial counsel be raised in an initial-review collateral proceeding (such as the PCRA), a petitioner may be able to establish "cause" sufficient to overcome a procedural default of "a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective [under the standards of Strickland]." 132 S.Ct. at 1320. The Supreme Court based its decision on what it determined to be an equitable right to seek relief from a procedural default in a federal habeas matter. It did not hold that a petitioner has a constitutional right to counsel in initial-review collateral proceedings such as the PCRA. Martinez, 132 S.Ct. at 1313-21.

counsel's alleged deficient performance. This requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] proceeding would have been different." Id. at 694. See also Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

Pennsylvania law for judging ineffectiveness corresponds with the Strickland standard. Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987); Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999). Although Pennsylvania courts typically articulate a three-prong test for gauging ineffective assistance claims[6] and Strickland sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts.

In Hales 4, the trial court explained why it concluded this ineffective assistance claim had no merit. The court first provided the relevant background information. It explained that on July 19, 2011, at the request of Attorney Placidi, it ordered a psychiatric evaluation of Petitioner. Subsequently, Attorney Placidi "secured well-known and respected psychiatrist, Robert Wettstein, M.D., to conduct the evaluation." (Hales 4, No. 665 of 2011, slip op. at 2). Dr. Wettstein performed the psychological evaluation on September 30, 2011. In his subsequent report, dated December 20, 2011, Dr. Wettstein wrote:

> There is no information by which to conclude that the defendant was experiencing a mental disease or defect such as that he was unable to know the nature and quality of his actions or their wrongfulness at the time that he strangled [the victim]…
> Whether the defendant had enough cognitive capacity to premeditate and deliberate the alleged offense is a complex matter to be determined by the jury. It is apparent that he was aware at all times that he was killing the victim whether with his hands or a knife. He did not describe a delusional or hallucinatory motive for strangling her, but then had a vaguely delusional feeling or fear before cutting her neck with a knife. The presence of that ideation, or even overt delusions, at the time of the alleged offense, does not preclude or obviate intentionality or the ability to premeditate and deliberate. He

---

[6] The three prongs of an ineffectiveness claim as stated by Pennsylvania state courts are: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. See, e.g., Commonwealth v. Miller, 746 A.2d 592, 598 (Pa. 2000).

expressed awareness of his actions at the time and knowledge of the utility of a knife to end her noise, breathing, and her life which was the goal at that point.

(Id. at 12 (quoting Dr. Wettstein's Report at 11-12)). The trial court further explained that prior to Petitioner's trial, it granted Petitioner's "Motion to Hire Expert," authorizing him to hire George Dowd, a licensed professional counselor and certified addiction counselor. Dowd was proffered to be an expert regarding the general effects of crack cocaine on a person's mental state. A report by Dowd dated January 18, 2012, was submitted to counsel and the court prior to trial. (Id. at 3).

In denying that portion of Petitioner's claim in which he argued that Attorney Placidi was ineffective for failing to call Dowd as an expert witness, the trial court held:

> Attorney Placidi petitioned the Court for funds to hire Mr. Dowd as an expert witness "regarding the effect of crack cocaine on a person's system and how that will affect the defendant's ability to form a specific intent to commit a crime." (Def.'s "motion to Hire Expert" at 1). The Court granted Attorney Placidi's request and Mr. Dowd was retained.
>
> Mr. Dowd's report, submitted to the Court prior to the trial, focused on the general effects of crack cocaine. (See Mr. Dowd's Report at 1-4). Consequently, Mr. Dowd was only able to provide a very general statement regarding the **possible** effects of crack cocaine on a person's mental state. He could offer no specific testimony about the effects of crack cocaine on Petitioner in this case. The report offered no opinion as to whether Petitioner was unable to form the specific intent to kill Christina Hulsinger because of his ingestion of crack cocaine. It was clear from the proffer that George Dowd was only capable of providing testimony regarding the general effects of crack cocaine on an individual and not Petitioner specifically. See N.T. Trial Day One at 8. In response to Attorney Placidi's proffer of Mr. Dowd's testimony, the Commonwealth stated that Mr. Dowd's testimony would be duplicative of their expert witness, Dr. Eric Vey, M.D. Id. at 19. Attorney Placidi countered that "if I can get this out with Dr. Vey, I may not need these people," referring to Mr. Dowd and Dr. Wettstein. Id. at 20.[2]
>
> [2]  Because opposing counsel had not received Mr. Dowd's *Curriculam Vitae*, the Court held its ruling as to the testimony of Mr. Dowd in abeyance. N.T. Trial Day One at 13. The Court returned to the matter after the Commonwealth finished its case in chief, at which time Attorney Placidi notified the Court it would not seek testimony from Mr. Dowd. N.T. Trial Day Two at 48.

Attorney Placidi, a seasoned veteran defense attorney who has conducted several cases in front of this Court, understood the limitations of Mr. Dowd's proffered testimony and reasoned that he could accomplish his purpose of informing the jury of the general effects of crack cocaine through the testimony of the Commonwealth's forensic pathologist, Dr. Eric Vey, M.D., In fact, the record reveals Attorney Placidi was able to elicit from Dr. Vey the general effects crack cocaine may have on an individual. This was precisely the basis for George Dowd's testimony.

(Id. at 7-8 (emphasis in original)).

The trial court compared the testimony given by Dr. Vey on cross-examination to the content of Dowd's report and concluded "that Dr. Vey's testimony encompasses and exceeds the general information provided by Mr. Dowd." (Id. at 9). "Consequently," the court explained, "Attorney Placidi was able to effectively cross-examine the prosecution witness and elicit the testimony he would have sought from Mr. Dowd; namely, that violent behavior is a potential direct consequence of cocaine use." (Id.)

The trial court concluded that Petitioner failed to meet any of the elements of an ineffective assistance claim with respect to Attorney Placidi's decision not to call Dowd. It explained:

First, Petitioner's claim that Attorney Placidi failed to either "introduce or argue evidence that was readily available" is patently false and lacks merit. Attorney Placidi not only secured Mr. Dowd as a proffered expert witness, he obtained funds from the Court to do so. The fact that Mr. Dowd's opinion did not rise to the level of "expert psychiatric testimony" or was deemed by the Court to be too general and arguably duplicative of Dr. Vey's testimony does not render Attorney Placidi ineffective. As demonstrated above, Attorney Placidi was able to secure and "introduce" evidence from Dr. Vey to support his diminished capacity defense. There is no merit to Petitioner's first claim regarding Attorney Placidi's failure to call George Dowd.

Second, the decision made by Attorney Placidi not to use Mr. Dowd as a witness demonstrated a reasonable trial strategy. Case law indicates that trial counsel need not introduce expert testimony on a client's behalf if counsel is able to effectively cross-examine prosecution witnesses and elicit helpful testimony. See Commonwealth v. K.M, 680 A.2d 1168, 1172 (Pa.Super. 1996). The Court had held the ruling regarding whether to allow testimony from George Dowd in abeyance. As an experienced trial attorney, Attorney Placidi allowed the testimony of Dr. Vey to unfold as a Commonwealth expert with impeccable credentials. Dr. Vey was effectively cross-examined by Attorney Placidi

and provided testimony to support Petitioner 's defense of diminished capacity. See supra at 8-9. As a medical doctor and forensic pathologist who has testified in more than one hundred trials as an expert in Erie County alone, (See N.T. Trial Day Two at 6), Dr. Vey was clearly more qualified to testify as an expert with a background in medicine as opposed to Mr. Dowd, a certified addiction counselor. Attorney Placidi had a reasonable basis to believe that Dr. Vey, as a Commonwealth witness, would have been viewed more credibly by the jury than a defense witness with his extensive experience in forensic pathology and numerous courtroom appearances.

Dr. Vey's testimony duplicated and exceeded the report of Mr. Dowd. Attorney Placidi quite simply got everything from Dr. Vey necessary to support and advocate the diminished capacity defense to the jury. This testimony provided a factual and legal basis for the instruction on diminished capacity to be given to the jury, and Attorney Placidi would use the testimony forcefully in his closing argument. Consequently, Attorney Placidi had a reasonable strategic basis not to further duplicate the testimony of Dr. Vey by calling an arguably lesser qualified witness, George Dowd. The second prong of the test for ineffective assistance of counsel is not met.

Third and finally, no prejudice resulted to Petitioner by Attorney Placidi's decision not to call Mr. Dowd. The testimony Attorney Placidi garnered from Dr. Vey through cross-examination enveloped the information contained in Mr. Dowd's report. This testimony secured a jury instruction regarding diminished capacity, which the jury seriously considered, as manifested in their request during deliberations to have the diminished capacity instruction read back to them. Every desired testimony of Mr. Dowd sought by Petitioner was provided by Dr. Vey. Therefore, Petitioner was not prejudiced by Attorney Placidi's decision not to further seek the testimony of George Dowd.

(Id. at 10-11).

The trial court next addressed that portion of Petitioner's claim in which he argued that Attorney Placidi was ineffective for failing to call Dr. Wettstein at trial. It held:

Prior to the start of the trial, the Court discussed the proffered testimony of Dr. Wettstein with counsel. As to Dr. Wettstein's ability to testify specifically as to Petitioner's diminished capacity due to voluntary intoxication, the following discussion was held:

The Commonwealth: To refresh [the Court's] recollection, I believe we discussed the fact that [Dr.] Wettstein was unable to render an ultimate opinion as to the ability to form intent, and went so far as to say it's a question for the fact finder in his report.

The Court: And, of course, if testimony comes in that certainly is one that can be asked on cross-examination.

21

The Commonwealth: Well, he couldn't render an opinion was the issue before.

The Court: I think you'll make that point very clear somehow.
. . .
The Court: Refresh my recollection. Of course, I authorized the expense for you to retain him and to examine the defendant.

Attorney Placidi: And he was initially retained to determine whether or not there was any question of any kind of diminished capacity.

The Court: ***And he couldn't render a specific opinion?***
Attorney Placidi: ***Right.***

N.T. Trial Day One at 14-15. (Emphasis added).

Based on the fact that Dr. Wettstein could not come to an ultimate opinion on Petitioner's diminished capacity and whether he was unable to form the specific intent to kill based on his use of crack cocaine, Attorney Placidi then offered him as an expert on the general effects of crack cocaine on a person's mental state. Id. at 15. The Court ruled that, based on Dr. Wettstein's report and the fact that he could not render an opinion regarding the ultimate issue of diminished capacity, Dr. Wettstein would not be qualified as an expert witness in that regard. See id. at 17. At that point, the Commonwealth argued that Dr. Wettstein's testimony, like that of Mr. Dowd's, would be duplicative of Dr. Vey's. Id. at 19. Attorney Placidi then gave a reasoned response that if he could procure testimony relating to the general effects of crack cocaine on a person's mental state from Dr. Vey, he would not need to call Dr. Wettstein or Mr. Dowd. Id. at 20. The record of Dr. Vey's testimony demonstrates that Attorney Placidi was able to accomplish that goal.

Case law states that if an expert witness cannot provide an opinion regarding the ultimate issue of one's ability to form the specific intent to kill, that testimony is inadmissible. See Commonwealth v. McCullum, 738 A.2d 1007, 1010 (Pa. 1999). In the instant case, Dr. Wettstein could not testify as to whether Petitioner had the ability to formulate the specific intent to kill, claiming it was "a complex matter to be determined by the jury." (Dr. Wettstein's Report at 11). In fact, Dr. Wettstein's testimony may have been detrimental to Petitioner because he went on to state that any homicidal ideation or delusions Petitioner experienced while ingesting cocaine the night of the homicide would "not preclude or obviate intentionality or the ability to premeditate and deliberate." (Id. at 12). Further, Dr. Wettstein stated Petitioner had "expressed awareness of his actions at the time and knowledge of the utility of a knife to end her noise, breathing, and her life which was his goal at that point." (Id.). This testimony would have been supportive of the Commonwealth's case that Petitioner could and did have the specific intent to kill Christina Hulsinger, despite his ingestion of crack cocaine.

22

It defies common sense for Petitioner to now claim Attorney Placidi was ineffective for failing to call a witness that contradicted his own theory of defense. In the context of applicable law of ineffective assistance of counsel, Petitioner's claim is without arguable merit because Attorney Placidi did obtain Dr. Wettstein as an expert witness and had Petitioner evaluated by him.

Petitioner is having difficulty with the notion that Dr. Wettstein was not called at trial, but this was because Dr. Wettstein did not survive the Court's scrutiny and also because he would have contradicted Petitioner's defense. The first prong of the test for ineffective assistance of counsel, therefore, is not satisfied.

Second, Attorney Placidi clearly had a reasonable basis to rely on Dr. Vey's testimony as to the general effects of crack cocaine on a person rather than Dr. Wettstein. Dr. Wettstein's testimony was potentially damaging to Petitioner's case because of his previous statements that Petitioner was aware of his actions at the time of the murder. Again, Attorney Placidi would arguably been ineffective if he had called Dr. Wettstein as a witness because of the testimony undermining Petitioner's diminished capacity defense. The second prong of the test for ineffective assistance of counsel, consequently, is not satisfied.

Finally, Petitioner cannot in any way demonstrate he was prejudiced by Attorney Placidi's failure to call Dr. Wettstein as an expert witness. Dr. Wettstein's testimony was constrained to simply an opinion on the general effects of crack cocaine and he could not render an opinion as to whether Petitioner' s use of crack cocaine eliminated his ability to form the specific intent to kill. In fact, Dr. Wettstein 's report, as indicated above, stated the opposite. Dr. Wettstein stated that Petitioner's ingestion of crack cocaine did "not preclude or obviate intentionality or the ability to premeditate and deliberate." (Dr. Wettstein's Report at 12). Dr. Wettstein also stated that Petitioner had "expressed awareness of his actions at the time and knowledge of the utility of a knife to end her noise, breathing, and her life which was his goal at that point." (Id.)

Based on that report, Attorney Placidi could not call Dr. Wettstein in fear of contradicting his own theory of defense. Attorney Placidi did secure testimony from Dr. Vey regarding the general effects of crack cocaine and this was ample enough to support a jury instruction on diminished capacity. Therefore, Petitioner is unable to show he was prejudiced by counsel's inaction, and Petitioner fails to satisfy the third prong of the test for ineffective assistance of counsel.

Based on this assessment, Petitioner has failed to satisfy any of the three prongs necessary to support an ineffective assistance of counsel claim (i.e., there is no merit to the claim, Attorney Placidi demonstrated a reasonable strategic basis for his actions, and Petitioner showed no prejudice) as it relates to the testimony of Dr. Robert Wettstein. See Commonwealth v. Miller, supra. Therefore , this claim must also be dismissed.

(Id. at 12-15 (emphasis in original)).

There is no basis disturb the state court's decision to deny this claim under AEDPA's deferential standard of review. Because the trial court applied the Strickland standard when it evaluated Petitioner's ineffective assistance claim, its adjudication withstands review under the "contrary to" clause of § 2254(d)(1). Williams, 529 U.S. at 406. It also withstands review under the "unreasonable application" clause of § 2254(d)(1). The Supreme Court has instructed:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689; Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, [Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. [Id.] Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 562 U.S. at 105 (parallel citations omitted) (emphasis added). Petitioner has not established that there is no reasonable argument that Attorney Placidi satisfied Strickland's deferential standard. Id. That is, he has not met his burden of demonstrating that the trial court's adjudication of this claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103. Therefore, the Superior Court's adjudication was not an "unreasonable application of" Strickland. Finally, Petitioner has not met his burden of establishing that of demonstrating that the state courts' decision to deny this claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Based upon all of the foregoing, in the event the Court does not deny this claim because it is procedurally defaulted, it should be denied on the merits.

24

**D.     Certificate of Appealability**

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. 28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. Applying those standards here, jurists of reason would not find it debatable whether each of Petitioner's claims should be denied. Accordingly, a certificate of appealability should be denied.

### III.   CONCLUSION

For the foregoing reasons, it is respectfully recommended that the petition for a writ of habeas corpus be denied and that a certificate of appealability be denied.

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the parties are allowed fourteen (14) days from the date of this Order to file objections to this Report and Recommendation. Failure to do so will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011).



/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: November 19, 2015

cc:      The Honorable Barbara Rothstein
         United States District Judge